## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RONALD CRESTA, Individually and on Behalf of All Others Similarly Situated, | **Case No. _____** |
| Plaintiff, | **COMPLAINT – CLASS ACTION FOR VIOLATIONS OF SECTIONS 14(a) AND** |
| v. | **20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |
| ALLIQUA BIOMEDICAL, INC., DAVID JOHNSON, JOSEPH M. LEONE, GARY RESTANI, JEFFREY SKLAR, and MARK WAGNER, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Ronald Cresta ("Plaintiff"), by and through his undersigned counsel, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.     This action is brought as a class action by Plaintiff on behalf of himself and on behalf of all other similarly situated public common stockholders of Alliqua BioMedical, Inc. ("Alliqua" or the "Company") against the Company, David Johnson, Joseph M. Leone, Gary Restani, Jeffrey Sklar, and Mark Wagner, the members of Alliqua's board of directors (collectively referred to as the "Board" or the "Individual Defendants"), for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S,C. §§78n(a) and 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9 in connection with sale of the sale of all or substantially all of the Company's

assets to Celularity Inc. ("Celularity") through a transaction as alleged in detail herein ("Proposed Transaction").

2.      On January 5, 2018, Alliqua issued a press release announcing that it had entered into an Asset Purchase Agreement (the "Asset Purchase Agreement") by and among the Company and Celularity.   Pursuant to the Asset Purchase Agreement, Celularity will acquire all or substantially all of the Company's assets, including certain assets comprising its MIST, Biovance, and Interfyl product lines (the "Purchased Assets").

3.      Pursuant to the terms of the Asset Purchase Agreement, the consideration for the Proposed Transaction payable at closing to the Company will be $29 million in cash (the "Asset Consideration").

4.      As discussed below, the Asset Consideration appears inadequate, and the process by which Defendants agreed to consummate the Proposed Transaction is fundamentally unfair to Plaintiff and Alliqua's other public stockholders.

5.      On January 29, 2018, in order to convince Alliqua stockholders to vote in favor of the Proposed Transaction, Defendants authorized the filing of a materially incomplete and misleading Preliminary Proxy Statement on a Schedule 14A (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

6.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the valuation analyses conducted by the Company's financial advisor, Cowen and Company, LLC ("Cowen"); and (ii) the background process leading up to the Proposed Transaction.

7.      The special meeting of Alliqua stockholders to vote on the Proposed Transaction is forthcoming.  It is imperative that the material information that has been omitted from the Proxy

is disclosed to the Company's stockholders prior to the forthcoming shareholder vote so that they can properly exercise their corporate suffrage rights.

8. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Alliqua's stockholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## PARTIES

9. Plaintiff is, and has been at all relevant times, a stockholder of Alliqua common stock.

10. Defendant Alliqua is a Delaware corporation, with its principal executive offices at 1010 Stony Hill Road, Suite 200, Yardley, Pennsylvania 19067. The Company's common stock trades on the NASDAQ Capital Market under the ticker symbol "ALQA".

11. Defendant David Johnson ("Johnson") is, and has been at all relevant times, a director of the Company and currently serves as the Company's President and Chief Executive Officer ("CEO").

12. Defendant Joseph M. Leone ("Leone") is, and has been at all relevant times, a director of the Company.

13. Defendant Gary Restani ("Restani") is, and has been at all relevant times, a director of the Company.

14.     Defendant Jeffrey Sklar ("Sklar") is, and has been at all relevant times, a director of the Company.

15.     Defendant Mark Wagner ("Wagner") is, and has been at all relevant times, a director of the Company.

16.     The parties in paragraphs 11 through 15 are referred to herein as the "Individual Defendants" and/or the "Board." The Board and Alliqua may collectively be referred to as "Defendants." Each of the Individual Defendants herein is sued individually, and as an aider and abettor, as well as in his or her capacity as an officer and/or director of the Company, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

18.     This Court has jurisdiction over the Defendants because each Defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue had an effect in this District; and (ii) Alliqua is incorporated in this District.

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public stockholders of Alliqua (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

21.     This action is properly maintainable as a class action because:

a)  the Class is so numerous that joinder of all members is impracticable.  As of November 8, 2017, there were approximately 4.99 million shares of Alliqua common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public stockholders of Alliqua will be ascertained through discovery;

b)  there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i.    whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy in violation of Section 14(a) of the Exchange Act;

ii.   whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii.  whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

c) Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

d) Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e) the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f) Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**I.    Background of the Company and the Proposed Transaction**

22.    Alliqua is a provider of wound care solutions.  The Company operates in commercial wound care segment, which consists of approximately five product categories, such as Wound Bed Preparation & Stimulation; Human Biologics; Antimicrobial Protection; Exudate Management, and Contract Manufacturing.  Alliqua has a suite of wound care solutions that enable surgeons, clinicians, and wound care practitioners to address the challenges in chronic and acute wounds.  The Company has built its portfolio through its hydrogel technology platform, targeted

acquisitions, and through licensing and distribution agreements.  Alliqua's contract manufacturing business provides custom hydrogels to the original equipment manufacturer (OEM) market.

23.    On January 5, 2018, Alliqua issued a press release announcing the Proposed Transaction.  The press released, stated in relevant part:

### Alliqua BioMedical, Inc. Announces Definitive Asset Purchase Agreement with Celularity, Inc.

YARDLEY, PA., January 5, 2018 (GLOBE NEWSWIRE) -- Alliqua BioMedical, Inc. (NASDAQ: ALQA) ("Alliqua or the "Company"), a regenerative technologies company committed to restoring tissue and rebuilding lives, today announced a definitive agreement with Celularity, Inc. ("Celularity"), under which Celularity will acquire all of the property, assets and rights relating to the Company's advanced biologic wound care business - including Biovance® amniotic membrane allograft and Interfyl® Human Connective Tissue Matrix - and the Company's UltraMist® Therapy System and other therapeutic ultrasound platform products for an aggregate cash consideration of $29.0 million. No debt or significant liabilities are being assumed by Celularity in the transaction. Alliqua BioMedical's Board of Directors unanimously approved entering into the agreement.

"This is a transformative transaction for Alliqua," said David Johnson, Chief Executive Officer of Alliqua. "First, we will be able to strengthen our balance sheet by paying our debt in full. Second, we believe we will have an appropriate amount of working capital to drive our operating business forward in a positive way.  Finally, we will evaluate the appropriate options to allocate capital to maximize shareholder value."

"The acquisition of Alliqua's commercial infrastructure and product portfolio in the field of regeneration advances Celularity's goal of bringing back under one entity the proprietary end-to-end regenerative pipeline that was pioneered by Celularity's predecessor company, Anthrogenesis Corporation," mentioned Dr. Robert Hariri, Founder and CEO of Celularity. "This acquisition further positions Celularity to become the world leader in cell therapy and regenerative medicine, which have the potential to treat or cure many of today's most debilitating illnesses."

The asset purchase agreement includes all intellectual property and all license, marketing, development and supply agreements related to these businesses. The Company's contract manufacturing assets and operations are not included in the asset purchase agreement. The transaction is subject to certain customary closing conditions, including, among other things, Alliqua BioMedical

stockholder approval. There are no financing conditions associated with the transaction.

Cowen served as Alliqua's exclusive financial advisor in connection with this transaction.

The above description of the definitive agreement does not purport to be complete and is qualified in its entirety by reference to the definitive agreements, which Alliqua included as an exhibit to its Form 8-K filed today with the Securities and Exchange Commission.

**Additional Information and Where to Find It**

This communication is being made in respect of the proposed asset purchase transaction involving Alliqua and Celularity. Alliqua will prepare a proxy statement statement for its stockholders containing the information with respect to the asset purchase transaction specified in Schedule 14A promulgated under the Securities Exchange Act of 1934, as amended, and describing the proposed asset purchase transaction. When completed, a definitive proxy statement will be mailed to Alliqua's stockholders. Alliqua and Celularity may be filing other documents with the SEC as well. INVESTORS ARE URGED TO CAREFULLY READ THE PROXY STATEMENT REGARDING THE PROPOSED ASSET PURCHASE TRANSACTION AND ANY OTHER RELEVANT DOCUMENTS IN THEIR ENTIRETY WHEN THEY BECOME AVAILABLE BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED ASSET PURCHASE TRANSACTION. You may obtain copies of all documents filed with the SEC regarding this transaction, free of charge, at the SEC's website, http://www.sec.gov.

**About Alliqua BioMedical, Inc.**

Alliqua is a regenerative technologies company committed to restoring tissue and rebuilding lives. Through its sales and distribution network, together with its proprietary products, Alliqua offers solutions that allow clinicians to utilize the latest advances in regenerative technologies to bring improved patient outcomes to their practices.

Alliqua currently markets the human biologic regenerative technologies, Biovance® and Interfyl®. The Company also markets its UltraMist® Therapy System, which delivers painless, noncontact low-frequency ultrasound below the wound bed to promote the healing process.

Alliqua can provide a custom manufacturing solution to partners in the medical device and cosmetics industry, utilizing its hydrogel technology. The Company

has locations in Yardley, Pennsylvania, Langhorne, Pennsylvania and Eden Prairie, Minnesota.

For additional information, please visit http://www.alliqua.com. To receive future press releases via email, please visit http://ir.stockpr.com/alliqua/email-alerts.

### About Celularity, Inc.

Celularity, headquartered in Warren, New Jersey, is a biotechnology company that has leading-edge technology and an associated intellectual property portfolio that uniquely positions Celularity to harness the power of the placenta. Their asset portfolio consists of more than 800 granted patents worldwide, as well as pre-clinical and clinical assets including CAR constructs for allogeneic CAR-T/NK products, and commercial stage biosourcing and functional regeneration businesses. For more information, please visit www.celularity.com. Follow Celularity on Social Media: @Celularity.[1]

24.     The Asset Consideration the Company stands to receive if the Proposed Transaction is consummated is unfair and inadequate because, among other things, the intrinsic value of the Alliqua is materially in excess of the amount offered given the Purchased Asset's prospects for future growth and earnings.

25.     For example, on August 10, 2017, Alliqua reported its financial results for the Second Quarter of 2017.  Notably, the Company reported a ***23.6% increase*** in Revenue and a ***34.4% increase*** in product sales.  Notably, Biologic sales were ***106%*** and UltraMist sales were up ***147%***.[2]

---

[1]     Alliqua BioMedical, Inc., Current Report (Form 8-K), at Exhibit 99.1 (Press Release, dated January 5, 2018, issued by Alliqua BioMedical, Inc.) (Jan. 5, 2018).

[2]     *Alliqua BioMedical, Inc. Reports Second Quarter of Fiscal Year 2017 Financial Results*, SEEKING ALPHA (Aug. 10, 2017), *available at* https://seekingalpha.com/pr/16912397-alliqua-biomedical-inc-reports-second-quarter-fiscal-year-2017-financial-results.

26.     On August 28, 2017, Alliqua's shares *increased by 32%* on the news that the FDA granted 510(k) clearance for its SilverSeal Hydrogel wound dressing.[3]

27.     On November 9, 2017, Alliqua held its Third Quarter 2017 Results – Earnings Call. During the call, Brad Barton, the Company's Chief Operating Officer, commented on the Company's recent performance, noting:

> For the third quarter of 2017, we grew our total revenue 12% year over year to $4.9 million.  This total revenue performance in the quarter was driven by *14% growth in our products business*. The growth in our products business during the quarter was due to *continued strength in sales of our regenerative products, with 70% growth year-over-year in our Biologics and contributions from strong UltraMIST system sales as well*.[4]

Likewise, Brian Posner, the Company's Chief Financial Officer, also noted during the call that:

> Our third quarter revenue performance *reflects the continued success* of our targeted sales and marketing strategy to drive growth in our regenerative products.
>
> As a reminder, this strategy consists of three primary elements. *First, we've enhanced the focus of our selling organization on driving sales of regenerative products, Biovance, Interfyl and UltraMIST into key segments of the market where they are well positioned for growth*. We began to see traction in these market segments during 2016 and we then increased our focus accordingly in 2017.[5]

28.     Furthermore, the valuation analyses conducted by Cowen in their fairness opinions indicate that the value of Purchased Assets has substantially greater value than represented by the Asset Consideration.  For example, Cowen's *Analysis of Selected Transactions* indicates an

---

[3]     *FDA clears Alliqua BioMedical's SilverSeal wound dressing; shares up 32%*, SEEKING ALPHA (Aug. 28, 2017), *available at* https://seekingalpha.com/news/3292130-fda-clears-alliqua-biomedicals-silverseal-wound-dressing-shares-32-percent.

[4]     *Alliqua BioMedical's (ALQA) CEO David Johnson on Q3 2017 Results – Earnings Call Transacript,* SEEKING ALPHA (Nov. 9, 2017), *available at* https://seekingalpha.com/article/4122912-alliqua-biomedicals-alqa-ceo-david-johnson-q3-2017-results-earnings-call-transcript?part=single.

[5]     *Id.*

implied enterprise value as high as ***$43.7 million***, which illustrates that the Purchased Assets have an inherent premium of ***approximately 51%*** over the $29.0 million Asset Consideration.

29.     It is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's shareholders can properly exercise their corporate suffrage rights and make a fully informed decision concerning whether to vote in favor of the Proposed Transaction.

## II.     The Proxy is Materially Incomplete and Misleading.

30.     On January 29, 2018, the Defendants filed a materially incomplete and misleading Proxy with the SEC and disseminated it to Alliqua stockholders.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents or omits material information that is necessary for the Company's stockholders to make an informed voting decision in connection with the Proposed Transaction.

### *Material Omissions Concerning Cowen's Financial Analysis*

31.     With respect to Cowen's *Discounted Cash Flow Analysis*, the Proxy fails to disclose the following key components used in the analysis: (i) Cowen's terminal value at calendar year 2021; (ii) the inputs and assumptions underlying the calculation of the exit multiples of EV/revenue ranging from 1.25x to 1.75x; (iii) the inputs and assumptions underlying the calculation of the discount rates ranging from 16.0% to 18.0%; and (iv) the inputs and assumptions underlying the calculation of the terminal EV/revenue multiples ranging from 1.25x to 1.75x  *See* Proxy 40.

32.     These key inputs are material to Alliqua's common stockholders, and their omission renders the summary of Cowen's *Discounted Cash Flow Analysis* incomplete and misleading.  As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices

include "the appropriate discount rate, and the terminal value…" *Id.*   As Professor Davidoff explains:

> **There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars**…. This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.   **This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion *unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices***. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78.

33.     With respect to Cowen's *Analysis of Selected Publicly Traded Companies*, the Proxy states that the individual multiples for certain companies were "Not Meaningful" and that "[r]evenue multiples above 15.0x are considered not meaningful."  However, the Proxy fails to disclose why these multiples were considered not meaningful and whether or not they were considered when Cowen calculated the Average EV/NTM Revenue Multiples and the implied range of EV for Alliqua.  The omission of why the multiples were designated "not meaningful" and whether they were considered renders the summary of the analysis and the implied enterprise value range misleading.  A fair summary of the *Analysis of Selected Publicly Traded Companies* requires the disclosure of why the multiples were designed "not meaningful" and whether they were considered when Cowen calculated the Average EV/NTM Revenue Multiples and the implied range of EV for Alliqua; merely designating the multiples as "not meaningful" leaves Alliqua stockholders unable to assess whether the banker applied or disregarded certain multiples in order to drive down the Company's enterprise value.

34.     Similarly, with respect to Cowen's *Analysis of Selected Transactions*, the Proxy states that the individual multiples for certain companies were "Not Meaningful" and that "[r]evenue multiples above 15.0x are considered not meaningful."  For the same reasons discussed above, the omission of why the multiples were designated "not meaningful" and whether they were considered renders the summary of the analysis and the implied enterprise value range misleading

### Material Omissions Concerning the Sales Process

35.     The Proxy also fails to disclose or misstate material information relating to the sale process leading up to the Proposed Transaction.

36.     The Proxy fails to expressly indicate whether the confidentiality agreements the Company entered into with Party G, Party A, Party H, Party I, and Party J contained standstill provisions that are still in effect and/or "don't-ask-don't-waive" standstill provisions that are presently precluding these parties from making a topping bid for the Company.  *See* Proxy at 25-26, 28.  Such information is material to Alliqua stockholders as a reasonable Alliqua stockholder would find it material and important to their voting decision whether or not parties that had previously been interested in a potential acquisition of the Company are now foreclosed from submitting superior proposals.

37.     Defendants failure to provide Alliqua stockholders with the foregoing material information renders the statements in the *Background of the Asset Sale Transaction* section of the Proxy false and/or materially misleading.

38.     In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the expiration of the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding

whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

**COUNT I**

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder)**

39.     Plaintiff incorporate each and every allegation set forth above as if fully set forth herein.

40.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

41.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

42.     The omission of information from a Proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

43.     Defendants have issued the Proxy with the intention of soliciting the Company's common stockholders' support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information

regarding, amongst other things: (i) the valuation analyses conducted by the Company's financial

advisor, Cowen; and (ii) the background process leading up to the Proposed Transaction.

44.     In so doing, Defendants made untrue statements of fact and/or omitted material

facts necessary to make the statements made not misleading.  Each of the Individual Defendants,

by virtue of their roles as officers and/or directors, were aware of the omitted information but failed

to disclose such information, in violation of Section 14(a).   The Individual Defendants were

therefore negligent, as they had reasonable grounds to believe material facts existed that were

misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information

to common stockholders although they could have done so without extraordinary effort.

45.     The Individual Defendants knew or were negligent in not knowing that the Proxy

is materially misleading and omits material facts that are necessary to render it not misleading.

The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted

information identified above in connection with their decision to approve and recommend the

Proposed Transaction; indeed, the Proxy states that Cowen reviewed and discussed their financial

analyses with the Board, and further states that the Board considered the financial analyses

provided by Cowen, as well as its fairness opinion and the assumptions made and matters

considered in connection therewith.  Further, the Individual Defendants were privy to and had

knowledge of the projections for the Company and the details surrounding the process leading up

to the signing of the Asset Purchase Agreement.  The Individual Defendants knew or were

negligent in not knowing that the material information identified above has been omitted from the

Proxy, rendering the sections of the Proxy identified above to be materially incomplete and

misleading.  Indeed, the Individual Defendants were required to, separately, review Cowen's

analyses in connection with their receipt of the fairness opinions, question Cowen as to the

derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

46. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Asset Purchase Agreement and the preparation of the Company's financial projections.

47. Alliqua is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

48. The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**COUNT II**

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

49. Plaintiff incorporate each and every allegation set forth above as if fully set forth herein.

50.     The Individual Defendants acted as controlling persons of Alliqua within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Alliqua, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

51.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

52.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.   The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

53.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Asset Purchase Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

54.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

55.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

56.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the common shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.     Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.     Granting such other and further relief as this Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 22, 2018

**COOCH AND TAYLOR, P.A.**

*/s/ Blake A. Bennett*

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
Miles D. Schreiner
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com
mschreiner@monteverdelaw.com

Blake A. Bennett (#5133)
The Brandywine Building
1000 West Street, 10th Floor
Wilmington, DE 19801
Tel.: (302) 984-3800

*Attorneys for Plaintiff*

*Attorneys for Plaintiff*